UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 11-21804-CIV-ALTONAGA/Simonton

**ROBERTO MARROQUIN**,

    Plaintiff,

vs.

**GMRI, INC. d/b/a OLIVE GARDEN**,

    Defendant.
_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant, GMRI, Inc. d/b/a Olive Garden's ("Defendant['s]") Motion for Summary Judgment ("Motion") [ECF No. 33], filed on November 8, 2011. In the Motion, Defendant seeks summary judgment on Plaintiff, Roberto Marroquin's ("Plaintiff['s]") claims of owed minimum wages, overtime wages, and retaliation under the Fair Labor Standards Act ("FLSA"). On November 25, 2011, Plaintiff filed his Response [ECF No. 35] to Defendant's Motion. Defendant filed its Reply [ECF No. 36] on December 5, 2011. The Court has considered the parties' written submissions and the applicable law.

### I. BACKGROUND[1]

Defendant hired Plaintiff to work as a server in one of Defendant's restaurants on April 19, 2010.[2] (*See* Def.'s Statement of Undisputed Facts ("SUF") ¶ 5 [ECF No. 34]). Plaintiff was employed there until his termination on February 15, 2011. (*See id.* ¶ 69). Plaintiff alleges

---

[1] Unless otherwise noted, the facts are undisputed.

[2] Plaintiff's Wage Compensation Report indicates he was hired on April 19, 2010. (*See* SUF Ex. E [ECF No. 34-5]) ("Wage Compensation Report"). Plaintiff, however, claims he began working for Defendant in March 2010. (*See* Pl.'s Statement of Material Facts in Opposition ("SMFO") ¶ 1 [ECF No. 35-1]). This one month discrepancy in the start date is not material.

several claims against Defendant, including: (a) failing to pay Plaintiff minimum and overtime wages; and (b) wrongfully terminating Plaintiff in retaliation for his complaints to Defendant about FLSA violations. (*See* SMFO).

### A. Minimum Wages

Plaintiff, working as a server, was a tipped employee. (*See* SUF ¶ 6). While employed by Defendant, he was paid an hourly wage supplemented by tips. (*See id.* ¶ 7). Defendant took the maximum amount of "tip credit" from Plaintiff's wages. (*See id.* ¶ 8). A tip credit means that, under the FLSA, employers are allowed "to offset the minimum wage of an employee who customarily and regularly receives tips." (Mot. 10). While working as a tipped employee, Plaintiff was paid $4.23 per hour, plus tips. (*See* SUF ¶ 9). Plaintiff disputes qualifying as a tipped employee because "Defendant never explained to Plaintiff that the reason why he was being paid a reduced minimum wage was because he was going to receive tips." (SMFO ¶ 9). As a non-tipped employee, therefore, Plaintiff contends he should not have had his wages reduced by a tip credit. (*See id.*). Defendant, by contrast, claims it notified Plaintiff of his status when it handed him an employee handbook containing information about tipped employees and related credits. (*See* Reply 6–7).

In addition, Plaintiff asserts he was "required to attend pre-shift meetings that lasted an average of one hour[,]" for which he was never paid. (SMFO ¶ 2). "Defendant instructed Plaintiff and other employees not to clock in for these pre-shift meetings." (*Id.* ¶ 3). Defendant refutes this allegation, claiming instead that Plaintiff was paid $7.25 — required minimum wage under the FLSA[3] — for the only two pre-shift meetings held during Plaintiff's employment. (*See* SUF ¶ 14).

---

[3] The minimum wage is $7.25 per hour. *See* 29 U.S.C. § 206(a)(1)(C).

### B. Overtime Wages

Plaintiff also asserts he "worked six double shifts throughout his employment." (SMFO ¶ 8). Each shift, lasting "five hours[,]" caused him to exceed forty hours worked in a week, thereby entitling him to overtime wages of one and one-half times his normal wage. (*Id.*; Resp. 8). Defendant disagrees, asserting Plaintiff's payroll records indicate he worked only four double shifts during his employment, none of which caused his weekly total to exceed forty hours. (*See* Mot. 13). Defendant maintains Plaintiff, therefore, "never worked overtime" and is not entitled to overtime wages. (SUF ¶ 32).

### C. Walk-Outs

Plaintiff avers Defendant improperly charged him for "walk-outs[;]" *i.e.*, restaurant customers who leave without paying the bill. (Resp. 7). Plaintiff claims he is therefore entitled to reimbursement for amounts "charged as an employee meal and taken from his tips." (*Id.*). Defendant contests this assertion on the basis that Plaintiff's payroll records clearly indicate Plaintiff "never paid for any walk-outs." (SUF ¶ 18).

### D. Plaintiff's Termination

#### 1. Defendant's Policy

Defendant's Team Member Handbook has a policy that states:

> Personal conduct should reflect respect and dignity toward guests, fellow employees, vendors, and management. The following behaviors are examples of unacceptable personal conduct that violates our Core Values and the commitment to compatibility with your co-workers and guests. These are examples of behaviors that will lead to severe disciplinary action, up to and including termination:
>
> - Disregarding or refusing to follow a manager's instructions;
> - Failure to cooperate with any investigation;
> - Quarreling, fighting, or using abusive language;

- Willfully damaging company property or property of others;
- Threatening others;
- **Embarrassing guests** (by returning tips, for example).

(SUF ¶ 46) (emphasis in original).

### 2. Tip Incident

On February 14, 2011, Plaintiff had an incident with a guest regarding the appropriate amount of gratuity to leave. Allegedly, when one of Plaintiff's customers was about to pay for the meal, he asked Plaintiff "what was a good tip[?]" (SMFO ¶ 12). In response, Plaintiff wrote down "good? 18%" on the guest's check. (*Id.* ¶ 13). The customer then "gave Plaintiff his credit card and cash and Plaintiff asked George, one of his managers . . . how to get this tip because his customer was willing to pay it." (*Id.* ¶ 14). "George agreed to put in the 18% . . . and told Plaintiff that if a customer asks what is a good tip, to tell the customer." (*Id.* ¶¶ 15–16).

Defendant states that suggesting gratuity violates company policy. (*See* SUF ¶ 60). Instead, Plaintiff "should have simply told the guest that tips were up to his or her discretion." (*Id.* ¶ 61).

### 3. Plaintiff's Termination

Plaintiff was fired on February 15, 2011, and two days later met with Jan Baltus, the Director of Operations overseeing Defendant's business, to discuss the reasons for his termination. (*See id.* ¶¶ 3, 62, 69). Defendant maintains it terminated Plaintiff for violating the company's personal conduct policy. (*See id.* ¶¶ 55–56). Plaintiff disagrees, arguing he was actually fired in retaliation for his complaints to management about FLSA violations. (*See* SMFO ¶ 17). In particular, Plaintiff complained to Louis,[4] a manager at the restaurant, "that the

---

[4] Plaintiff is unable to recall Louis's last name. (*See* SUF Ex. B at 18 [ECF No. 34-2]) ("Dep. of Pl.").

4

company's policy of having servers attending meetings off-the-clock and being allowed to clock in only after their first table came in was illegal in violation of the FLSA." (*Id.* ¶ 10). Plaintiff states he was fired for complaining, and Louis merely used the tip incident as "an excuse to get rid of Plaintiff[.]" (*Id.* ¶ 17).

\* \* \*

On April 26, 2011 Plaintiff filed the Complaint [ECF No. 1-2] in the Eleventh Judicial Circuit in Miami-Dade County, Florida. The case was subsequently removed on May 18, 2011 [ECF No. 1]. In the Complaint, Plaintiff alleges three counts: (1) failure to pay minimum wages; (2) failure to pay overtime wages; and (3) retaliation under the FLSA. (*See* Compl.). In the Motion, Defendant asks the Court to enter summary judgment on all counts.

## II. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]he Court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Hayes v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-

CIV, 2008 WL 2914977, *2 (S.D. Fla. Jul. 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. ANALYSIS

Defendant asserts there are no genuine issues of material fact as to Plaintiff's claims, and as a matter of law, it is entitled to summary judgment. (*See* Mot. 1). In his Response, Plaintiff asserts his claims of FLSA violations regarding minimum wages, overtime wages, and improper termination on the basis of retaliation are sufficient to survive the Motion. (*See* Resp.).

### A. Wages

#### 1. Minimum Wages

##### a. Tip Credit

Plaintiff claims Defendant improperly reduced his wages below the required minimum, by taking a tip credit, "because it never informed Plaintiff of its intention to take [the tip credit] based on his qualification as a tip employee." (Resp. 5). In a FLSA case, "[t]he defendant bears the burden of establishing that it is entitled to claim the 'tip credit.'" *Ash v. Sambodromo, LLC*, 676 F. Supp. 2d 1360, 1369 (S.D. Fla. 2009) (quoting *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979)). If the employer does not satisfy its "burden of showing the applicability of the tip credit, the employee is entitled to the full minimum wage for every hour worked." *Id.* (internal quotation marks omitted). Pursuant to 29 U.S.C. § 203(m), the following requirements must be met to claim a tip credit: "(1) the tip credit must be claimed for qualified tipped employees; (2) the employees must receive proper notice of Section 203(m); and (3) all tips received by the employees must be retained by them." *Id.* (citing 29 U.S.C. § 203(m)).

Plaintiff acknowledges he received an employee handbook containing a section titled "Notice to Tipped Employees of Tip Credit[.]" (Resp. 5). He maintains, however, the handbook

was insufficient because it does not precisely "list the positions classified as tipped employees." (*Id.*). In essence, Plaintiff argues that because his job title — "server" or "waiter" — was not expressly listed as a "tipped employee" in the Handbook, he was unaware Defendant could take the tip credit. According to Plaintiff, reducing his wages below the required minimum, therefore, violated the FLSA.

To properly "notify" an employee, an employer "must inform its employees that it intends to treat tips as satisfying part of the employer's minimum wage obligations." *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310 (S.D. Fla. 2007) (citing *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998)). "'Employers do not have to 'explain' the tip credit to employees, however; it is enough to 'inform' them of it.'" *Id.* (quoting *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048(GEL), 2006 WL 851749, at *19 (S.D.N.Y. Mar. 30, 2006)). "To 'inform' an employee requires less effort than it would to 'explain' the tip credit to the employees." *Id.* (quoting *Kilgore*, 160 F.3d at 298).

Plaintiff's claim that he did not know he was a tipped employee is meritless and fails to create a triable issue. Plaintiff cites no case law supporting his position on this issue. Furthermore, Plaintiff admits to working as a server. (*See* Dep. of Pl. 43). Lastly, and most importantly, he thoroughly explains the tip process in his deposition:

> Q: How are you paid? Hourly, $4.23?
>
> A: Yes, hourly **and then the tips**.
>
> Q: Your hourly rate is $4.23?
>
> A: I really don't remember how much is that.
>
> Q: Is it less than minimum wage, and then you keep the tips?
>
> **Do you keep the tips completely**?

>     A:     **No. We share them with the bartender and the busser and the food runner**.

(*Id.* 33) (emphasis added). Plaintiff clearly acknowledges that part of his compensation includes tips from guests, which he can then share with the staff if he so chooses. The undisputed evidence, therefore, establishes Plaintiff knew he was a tipped employee.

The Court next turns to the issue of whether receiving a handbook containing company policy regarding tip credits constitutes sufficient "notice." *Kilgore* is illustrative to the case at bar. There, new servers were given a "file folder" containing a statement about Outback's tip policy. *Kilgore*, 160 F.3d at 299. The policy stated employees understand that Outback will use a tip credit to offset minimum wages. *See id.* The plaintiff, however, claimed she was not given proper notice because she was never told to read the new employee materials regarding the tip credit. *See id.* The Sixth Circuit disagreed, persuaded by an Outback manager's affidavit asserting that the plaintiff merely *received* materials including the tip policy. *Id.* (emphasis added). The court held "that providing this information to [the plaintiff] satisfied the subsection 203(m) requirement to inform her of Outback's intent to treat tips as satisfying part of the her minimum wage." *Id.* at 300.

Here, Defendant asserts Plaintiff received an employee handbook stating the company takes the maximum tip credit for all tipped employees. (*See* Reply 7). Plaintiff acknowledges that the handbook contains a section about the tip credit. (*See* Resp. 5). Persuaded by analogous facts in *Kilgore*, the Court finds Defendant has satisfied the subsection 203(m) requirement of notification.

Regarding the third element, if a restaurant requires tipped employees to participate in a tip pool whereby they are required to share tips with non-tipped employees, the employer is

8

prohibited from taking a tip credit. *See Ash*, 676 F. Supp. 2d at 1369. Here, however, Defendant does not have a tip-sharing policy. (*See* SUF Ex. Q at 5 [ECF No. 34-17]) ("Dep. of Jan Baltus"). Moreover, Plaintiff does not maintain in his Response that he was required to share tips with non-tipped employees. (*See* Resp. 4–5). In fact, Plaintiff admits he tipped others "whatever [he] wanted to give them[.]" (Dep. of Pl. 70). Therefore, it is undisputed that Defendant did not have a mandatory tip-sharing policy.

The Court finds there are no genuine issues of material fact regarding Defendant's ability to take a tip credit from Plaintiff's wages. Accordingly, to the extent his minimum wage claim is based on the tip credit, the Court grants summary judgment on this issue.

### b. Pre-Shift Meetings

Plaintiff contends he was required to attend mandatory meetings, each lasting approximately one hour, before each shift he worked. (*See* Resp. 6). He contends these pre-shift meetings related to his job duties as a server, thereby entitling him to be paid the minimum wage of $7.25 per hour. (*See id.* 7). He was not, however, paid for the pre-shift meetings and thus requests back wages.[5] (*See id.*).

Defendant refutes Plaintiff's assertions, claiming instead that servers are not required to attend hour-long meetings before their shifts. (*See* Mot. 12). Rather, all the information servers need for the shift is communicated to them "three to five minutes after they clock in." (*Id.*). During the entire length of Plaintiff's employment, there were only two pre-shift meetings. (*See id.*). As evidence, Defendant has attached Plaintiff's payroll records indicating he was paid $7.25 per hour — the minimum wage — for pre-shift meetings held on May 6, 2010 and June

---

[5] Plaintiff repeatedly claims the pre-shift meetings lasted about one hour. (*See* SMFO ¶ 2; Resp. 6). When calculating his damage amount, however, Plaintiff uses *two hours* instead of one hour, effectively doubling his damages. (*See* Resp. Ex. 3 at 3 [ECF No. 35-3]) ("Plaintiff's Answers to Interrogatories").

9

26, 2010. (*See* SUF Ex. D at 2, 3 [ECF No. 34-4]) ("Clock In/Out Report").

Plaintiff's response, however, is that the Clock In/Out Report does not tell the whole story. Plaintiff maintains that Defendant routinely prohibited him from clocking in until his first table of customers arrived. (*See* Resp. 7). If he was not allowed to clock-in until his first guests showed up, the Clock In/Out Report, by default, could not have reflected his presence at the restaurant because the pre-shift meetings necessarily occurred before his customers arrived. (*See id.*). The Clock In/Out Report is therefore, incomplete. (*See id.* 6–7).

"'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (quoting *Anderson*, 477 U.S. at 255).

In FLSA cases, a plaintiff "bears the burden of proving that he or she worked overtime without compensation, [but] '[t]he remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making that burden an impossible hurdle for the employee.'" *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Because "[i]t is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment[,]" the employer, by nature of the employer/employee relationship, "is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed and '[e]mployees seldom keep such records themselves.'" *Id.* (quoting *Mt. Clemens Pottery Co.*, 328 U.S. at 687).

*Allen* is determinative to the case at bar. There, several former county employees sued

the defendant for failure to compensate them for time worked, thus violating the FLSA.[6] *See id.* at 1309. In particular, some of the plaintiffs questioned the accuracy of the defendant's records because they did not always reflect actual time worked. *See id.* at 1316. For example, after recording overtime hours, some employees were "made to take back their accurate time sheets and resubmit new time sheets that reflected their scheduled, not actual, hours." *Id.* The court stated that because the "records cannot be trusted . . . the employee carries its burden proving that he or she performed work without proper compensation if he or she produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*

In *Allen*, the plaintiffs' testimony about not being allowed to record actual time worked was enough to create an inference that the plaintiffs "would have reported their overtime if they had not been discouraged from doing so." *Id.* at 1317. The defendant's motion for summary judgment, therefore, was denied.[7] *See id.*

---

[6] Although the Eleventh Circuit examined the plaintiffs' uncompensated time in the context of overtime hours, rather than minimum wages, the heart of that analysis — like here — centered around alleged hours worked that should have been paid for.

[7] The defendants also tried to support their summary-judgment motion by claiming they did not know the plaintiffs were working extra hours. *Allen*, 495 F.3d at 1318. The Eleventh Circuit discussed actual and constructive knowledge, finding that evidence of either one could create a genuine issue of material fact. *See id.* at 1318–23. Although Defendant does not make the same argument in this case, the Court is persuaded by the Eleventh Circuit's findings regarding three plaintiffs in particular. First, one plaintiff testified she worked overtime by coming in early and working during her lunch break. *See id.* at 1322. When she arrived early and recorded her actual arrival time, the defendant "corrected her and told her to sign in the time she was *scheduled* to arrive." *Id.* (emphasis added). Another plaintiff testified she worked overtime and told her supervisor she was working more hours than those reflected on her time sheet. *See id.* But "[w]hen she recorded her actual hours worked, the [defendant] called her and told her that she needed to put her scheduled time on her time sheet." *Id.* A third plaintiff stated she worked overtime with defendant's knowledge, yet was not properly compensated. *See id.* These plaintiffs "presented evidence that created a genuine issue of material fact as to whether the [defendant] should have known of their uncompensated work." *Id.* at 1321.

Plaintiff's assertions are analogous to those of the first two plaintiffs in *Allen* because by preventing Plaintiff from clocking in when he arrived at the restaurant for the pre-shift meetings,

Here, Plaintiff testified that he was required to attend off-the-clock meetings. (*See* SMFO ¶¶ 2–3; Resp. 6–7; Dep. of Pl. 18–19). Although some of the factual disputes in *Allen* are not similar to those presented here,[8] the central contention is the same — that Plaintiff would have clocked in at the beginning of the pre-shift meetings had Defendant not prevented him from doing so. Here, as in *Allen*, Plaintiff presents a triable issue of fact that he was not compensated for all his time worked. Accordingly, Court denies Defendant's motion for summary judgment on this issue.

### c. Walk-Outs

Plaintiff also claims Defendant owes him back wages for "walk-outs." (Resp. 7–8). A walk-out occurs when a customer leaves without paying the bill. According to Plaintiff, Defendant deducts the cost of the meal from the server's wages. (*See id.* 7). Plaintiff's Wage Compensation Report shows no deductions for walk-outs. (*See* Wage Compensation Report). Plaintiff's contrary testimony creates a triable issue of fact, and therefore, summary judgment is not appropriate on this claim.

### 2. Overtime Wages

Plaintiff avers that during the length of his employment, he worked approximately six "double shifts[,]" causing him to exceed forty hours for the week and thereby entitling him to overtime pay.[9] (Resp. 8). Each additional shift lasted five hours. (*See* SMFO ¶ 8).

---

Defendant was "manipulating" Plaintiff's arrival time to reflect the time he was "scheduled" to be at the restaurant — that is, when his first customers arrived. Similar to the third plaintiff in *Allen*, Plaintiff maintains that because Defendant was requiring him to attend the meetings, Defendant had knowledge he was working while not on the clock.

[8] Some the employees' records in *Allen* were allegedly "torn up[,]" "white[d] out[,]" or "destroyed." *Allen*, 495 F.3d at 1316–17.

[9] Although Plaintiff refers to "six double shifts[,]" he does not list the specific dates of these shifts. (SMFO ¶ 8; Resp. 8).

"No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(2). "An employee who brings a lawsuit under the FLSA for unpaid minimum wages or unpaid overtime compensation and liquidated damages bears the initial burden of proving that she performed the work for which she was not properly compensated." *Perez v. Palermo Seafood, Inc.*, 548 F. Supp. 2d 1340, 1346 (S.D. Fla. 2008) (citation omitted).

Defendant has attached Plaintiff's Clock In/Out Report demonstrating Plaintiff worked double shifts on July 1, July 6, July 20, October 28,[10] and December 22, 2010. (*See* Clock In/Out Report). None of these five double shifts caused Plaintiff to work more than forty hours in one week.[11] (*See* Wage Compensation Report 5, 6, 11, 13).

According to Plaintiff, however, "Defendant is disregarding Plaintiff's testimony that when he worked [a] double shift he would come in at 10:00 a.m. but would only be allowed to

---

[10] Defendant does not list October 28, 2010 as a date on which Plaintiff worked a double shift. (*See* Reply 8). Upon review of the Clock In/Out Report, however, Plaintiff's first shift that day lasted 5.20 hours and his second shift lasted 4.23 hours. (*See* Clock In/Out Report 5). The Court concludes Plaintiff worked a double shift on this date; Plaintiff corroborates this date in his deposition. (*See* Dep. of Pl. 75).

[11]

| Double Shift Date* | Week End Date** | Total Hours Worked ** |
|---|---|---|
| Thursday, July 1, 2010 | July 4, 2010 | 36.07 |
| Tuesday, July 6, 2010 | July 11, 2010 | 24.92 |
| Tuesday, July 20, 2010 | July 25, 2010 | 29.37 |
| Thursday, October 28, 2010 | October 31, 2010 | 26.72 |
| Wednesday, December 22, 2010 | December 26, 2010 | 27.47 |

\*   Per the Clock In/Out Report
\*\* Per the Wage Compensation Report

13

clock in after his first table was seated, which could be sometime at [sic] 12:00 p.m." (Resp. 8). Plaintiff claims that these unaccounted-for hours — from 10:00 a.m. to 12:00 p.m. — pushed his weekly total over forty hours, entitling him to overtime pay. (*See id.*).

Plaintiff's claim is mathematically flawed because taking his assertions as true, the days on which he worked a double shift did not cause his work-week to exceed forty hours. For instance, on July 1, 2010, he clocked in at 11:29 a.m. (*See* Clock In/Out Report 3). His weekly total for that week was 36.07 hours. (*See* Wage Compensation Report 5). Assuming Plaintiff clocked in at 10:00 a.m. on July 1, the unaccounted-for one hour, twenty-nine minutes, when added to his weekly amount, totals thirty-seven hours, thirty-six minutes (short of forty hours). Nor do the remaining four weeks in which Plaintiff worked one double shift push him over forty hours; these weeks all totaled less than *thirty* hours before considering a 10:00 a.m. arrival time, therefore, an extra two hours worked on one day during the week leaves Plaintiff far short of forty hours. (*See* Wage Compensation Report 5, 6, 11, 13).

In sum, Plaintiff has provided insufficient evidence to create a triable issue of fact that he worked in excess of forty hours during weeks in which he worked a double shift. Accordingly, the Court grants Defendant's motion for summary judgment on this issue.

### B. Plaintiff's Termination

Defendant asserts it is entitled to summary judgment because Plaintiff cannot establish a prima facie case for retaliation under the FLSA. (*See* Mot. 13). In his Response, Plaintiff states "Defendant retaliated against him by terminating him for a pretextual reason." (Resp. 8). Specifically, Plaintiff asserts Defendant retaliated against him because Plaintiff "complained to Defendant about the illegal practice of having personnel work off-the-clock." (*Id.*).

The FLSA's anti-retaliation provision makes it unlawful to "discharge or in any other

manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). FLSA retaliation claims are governed by the same burden-shifting analysis applicable to retaliation claims under Title VII of the Civil Rights Act. *See Munroe v. PartsBase, Inc.*, No. 08-80431-CIV, 2009 WL 413721, at *7 (S.D. Fla. Feb. 18, 2009) (citation omitted).

"A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: '(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.'" *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000) (quoting *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–09 (10th Cir. 1997)). To prove a causal connection under the third prong of a *prima facie* case of retaliation, the Eleventh Circuit requires a plaintiff demonstrate "that the protected activity and the adverse action were not *wholly unrelated*." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (emphasis in original) (citation omitted). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Jones v. Miami-Dade Cty.*, No. 0320674CIV-ALTONAGA, 2005 WL 2456869, at *5 (S.D. Fla. July 29, 2005).

In the instant case, Plaintiff meets the first two prongs of the *prima facie* case: (1) he engaged in activity statutorily protected by the FLSA, and (2) he suffered an adverse employment action when he was terminated on February 15, 2011. Defendant contends, however, that Plaintiff does not satisfy the third prong of the analysis because Plaintiff has not demonstrated a causal connection between his termination and his complaints about not being paid overtime and minimum wages.

A plaintiff can establish a causal connection, for the purpose of a *prima facie* case, based on close temporal proximity between the adverse action and the protected activity. Specifically, the Eleventh Circuit has held that because a plaintiff can establish a *prima facie* case merely by showing the protected activity and the adverse employment action are not wholly unrelated, temporal proximity can provide a sufficient nexus to establish causation. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986). Here, however, Plaintiff does not maintain there is close temporal proximity between his termination and his protected activity. Nor would it likely be appropriate to do so — more than three months passed between the time Plaintiff complained to his manager and the day he was fired.[12] *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that a three to four month disparity between the statutorily protected expression and the adverse employment action is not enough to establish causation) (collecting cases).

Moreover, even assuming Plaintiff did meet his burden of establishing a *prima facie* case, his claim still fails as he does not present evidence that Defendant's legitimate, non-discriminatory reason for his termination is pretextual. Once a plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (internal quotation marks and citation omitted). The employer's burden of rebuttal is "exceedingly light." *Tipton v. Can. Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989) (internal quotation marks and citation omitted). "Since the rebuttal burden is one of production only, the employer 'need not persuade the court that it was actually motivated by the proferred [sic] reasons . . . . It is sufficient if the

---

[12] Plaintiff states he complained to Louis around September or October 2010. (*See* Dep. of Pl. 18). Plaintiff was not fired until February 15, 2011, over three months later. (*See* SUF ¶ 69).

16

[employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee].'" *Jones*, 2005 WL 2456869, at *5 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)) (alterations in original). If the employer meets its burden of production, in order to defeat summary judgment the plaintiff must demonstrate a "genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997).

Here, Defendant has offered a legitimate non-discriminatory reason for terminating Plaintiff — namely, for writing a suggested tip on a guest's check. On February 14, 2011, after Plaintiff's customer asked him about appropriate tip amounts, Plaintiff wrote on the guest's check, "good? 18%[.]" (SUF ¶¶ 57–58; SMFO ¶¶ 12–13). Plaintiff acknowledges that he wrote this on the customer's check. (*See* SMFO ¶ 13). Defendant maintains that it is against company policy for an employee to add a gratuity to a guest's check. (*See* SUF ¶ 52). Plaintiff does not refute this policy, nor does he claim he is unaware of it. Instead, Plaintiff claims he put the tip on his guest's check after one of Defendant's managers, George, "told Plaintiff that if a customer asks what is a good tip, to tell the customer." (SMFO ¶ 16). He suggests that because he received approval from George, his actions were not against policy, and by default the only possible explanation for Plaintiff's firing is that Louis used the tip incident to disguise his pretextual reasons for firing Plaintiff. (*See* Resp. 9). Notwithstanding Plaintiff's contention, he fails to demonstrate a genuine factual issue as to whether Defendant's proffered reason is pretextual.

Whether or not George approved his actions is irrelevant. This is because "[t]he heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons." *Standard v.*

17

*A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). Assuming Plaintiff received approval from George to suggest a tip, the appropriate question is "whether [Defendant] had a good faith belief that [Plaintiff] was guilty of the misconduct." *Jones*, 2005 WL 2456869, at *9. Here, Plaintiff does not present any evidence indicating Defendant did not have a good faith belief that Plaintiff suggested a tip to his customer, thereby violating company policy. Plaintiff was fired *the day after* this incident occurred. Nor does Plaintiff present any evidence that Defendant gave inconsistent reasons for its actions.

In sum, Plaintiff has not offered sufficient evidence to rebut Defendant's legitimate, non-retaliatory reasons for his termination. Accordingly, the Court is compelled to grant Defendant's summary judgment motion on this issue.

### C. Uniform Maintenance, Breakage

In its Motion, Defendant refutes Plaintiff's assertions that he was required to pay for uniform maintenance and for breakage of plates or glass. (*See* Mot. 6–9). In his Response, Plaintiff does not address these issues. Summary judgment against Plaintiff, therefore, is appropriate. *See Great Lakes Reinsurance (UK) PLC v. Morales*, 760 F. Supp. 2d 1315, 1318 (S.D. Fla. 2010) ("[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56] — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.") (internal quotation marks omitted).

### IV. CONCLUSION

For the foregoing reasons it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment **[ECF No. 33]** is **GRANTED** in part and **DENIED** in part.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of December, 2011.

*[signature]*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record